# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Kathleen S. Carter, Respondent,

v.

Joseph R. Carter, Appellant.

Appellate Case No. 2021-000030

———————

Appeal From Florence County
Timothy H. Pogue, Family Court Judge

———————

Opinion No. 6065
Heard February 6, 2024 – Filed June 20, 2024

———————

## AFFIRMED IN PART, REVERSED IN PART

———————

Rebecca Brown West, of Harling & West, LLC, of
Lexington, and Michele Dahl Sturkie, of Sturkie Law,
LLC, of Florence, for Appellant.

Marian Dawn Nettles, of Nettles, Turbeville & Reddeck,
of Lake City, and Brendan Padgett Barth, of Barth,
Ballenger & Lewis, LLP, of Florence, both for
Respondent.

———————

**THOMAS, J:** Joseph Carter (Husband) appeals the family court's Final Divorce
Decree (the Decree) dividing the marital estate, awarding $2,700 per month in
alimony to Kathleen Carter (Wife), and requiring him to pay Wife's attorney fees.
Specifically, Husband argues the family court erred in entering the Decree
because: (1) the family court lacked jurisdiction to divide Husband's nonmarital
retirement accounts; (2) the dates on which the family court valued certain debts

and assets were incorrect; (3) the values assigned to Wife's vehicle and jewelry are not supported by the greater weight of the evidence; (4) the amount of alimony awarded to Wife was excessive; and (5) the court erred in awarding fees to Wife. Husband also appeals the family court's order denying his motion for reconsideration. We affirm in part and reverse in part.

**FACTS**

Husband and Wife were married on May 15, 1999. Throughout the duration of the parties' nineteen-year marriage, the couple adopted four children, one of whom ("ZZ") is incapacitated due to disability.[1] Prior to and during the marriage, Husband worked as a self-employed chiropractor. Wife worked as a homemaker and cared for the children throughout the marriage. Wife left the marital home without notice to Husband. Wife then filed an action for separate maintenance and support seeking alimony, equitable apportionment of the marital estate, an order prohibiting the parties from selling or disposing of marital assets pending a merits hearing, and attorney fees. Husband responded seeking a divorce on the ground of continuous separation for one year, equitable apportionment of the marital estate, and an award of attorney's fees. Wife filed a motion for temporary relief, and a temporary order was filed. A final hearing took place and the Decree was signed. Neither party alleged fault in the divorce.

Between the filing of the action and the final hearing, Husband paid Wife $1,300 per month in spousal support. Husband also continued to pay for Wife's health insurance, car insurance, and cell phone through his business. The marital estate included a home, an investment account, personal property, several bank accounts, and two credit card debts.

Prior to the temporary hearing, the parties agreed upon and signed a limited agreement, which was approved by the court. The limited agreement provided: (1) ZZ shall continue to reside with Wife, and Wife will continue to receive ZZ's SSI check to be used in her support; (2) Husband shall be solely responsible for paying 100% of ZZ's therapy, counseling, and dental bills; (3) Husband and Wife shall both have access to ZZ's medical providers, therapists, and counselors, and both retain the right to discuss ZZ's treatment options; (4) Husband shall have sole and exclusive possession of the marital home, but the home must immediately be placed on the market, and any offer must be presented to both parties; and (5) Wife

---

[1] In the years leading up to this action, all of the children except ZZ had emancipated.

is entitled to sole and exclusive ownership of the couple's coin collection and piano if she so desires.

Of particular interest to the parties at the final hearing was the character of three retirement accounts in Husband's name, the Stifel Accounts, which were funded from the rollover of two vested retirement plans that Husband acquired prior to the parties' marriage. Wife believed these retirement accounts were marital in nature and cited to conversations with Husband during the marriage that led her to believe the accounts were preparing them both for retirement. However, Husband testified that no contributions were made to the accounts during the marriage. Husband testified to the history of the accounts at trial as follows:

> Well, back in the eighties and nineties we had a pension and profit-sharing plan. Back in 1997 it came—it became cost prohibitive to be able to do that plus provide health insurance for the employees and so health insurance [premiums] back then were just like now, they were just going astronomical, and so I sat the staff down and I said we've got to make tough decisions here, what do you want to do, and so they agreed that they—we would provide health insurance for the employees.

Husband explained that no contributions had been made during the marriage, and he provided pension and profit-sharing statements for 1994, 1995, and 1996. Wife did not present testimony or documents showing that the parties contributed to the profit-sharing plan and pension during the marriage. Wife offered no evidence contradicting Husband's testimony that he made no contributions to the profit-sharing plan, the pension, or the Stifel Accounts during the marriage. Husband testified that the plans became Stifel Nicolaus accounts sometime between 2004 and 2006 when it became too hard for him to work and manage his pension and profit-sharing accounts. The accounts were rolled over into IRA accounts at Stifel Nicolaus. At trial, Husband placed into evidence Certificates for the profit-sharing plan and pension showing his vested interests in the plans as of December 31, 1996, were valued at $309,907.99 and $219,619.17, respectively. During discovery, Husband provided Wife with statements from the profit-sharing plan and pension for 1994, 1995 and 1996 showing the value of the plans for several years immediately prior to the marriage. Neither party was able to acquire statements from the profit-sharing plan or pension reflecting the balance of the accounts on May 15, 1999, which was the date of the parties' marriage. Husband testified that some records burned in a fire and some records were no longer

available from the administrator because they were too old. Prior to Husband moving the assets to Stifel in 2004, the investments were managed by an Edward Jones advisor. Husband was unable to produce documents tracing the flow of his profit-sharing plan and pension plan assets to the Stifel Nicolaus IRAs because so much time had elapsed since the investments were rolled to Stifel Nicolaus. Husband and Wife stipulated that the total value of the three Stifel Accounts as of the date of filing was $767,910.51 and the total value at the time of trial was $757,058.96.

After the two-day trial, the family court granted the parties a divorce on the ground of continuous separation for one year. The marital home mortgage balance was valued at the date of trial rather than the date of filing. Wife was awarded $40,000 from Husband's nonmarital retirement accounts. The court accepted Wife's testimony of value for nearly all of the remaining marital property and debt. Wife was awarded monthly alimony of $2,700 and $10,000 in attorney's fees. Husband filed a motion for reconsideration. After a hearing, the family court denied Husband's motion and awarded Wife additional attorney's fees of $1,200. This appeal followed.

## STANDARD OF REVIEW

"In appeals from the family court, [the appellate c]ourt reviews factual and legal issues de novo." *Simmons v. Simmons*, 392 S.C. 412, 414, 709 S.E.2d 666, 667 (2011); *Lewis v. Lewis*, 392 S.C. 381, 386, 709 S.E.2d 650, 652 (2011). Although this court reviews the family court's findings de novo, we are not required to ignore the fact that the family court, which saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony. *Lewis*, 392 S.C. at 385, 709 S.E.2d at 651-52.

## LAW/ANALYSIS

### I.    Husband's Nonmarital Retirement Accounts

Husband argues the family court erred when it awarded Wife $40,000 from his three nonmarital retirement accounts. Specifically, Husband argues: (1) the family court lacked jurisdiction to divide his nonmarital retirement accounts; and (2) Wife is not entitled to special equity in his nonmarital retirement accounts. We agree.

Section 20-3-630(A) of the South Carolina Code (2014) defines the term "marital property" as "all real and personal property which has been acquired by

the parties during the marriage and which is owned as of the date of filing or commencement of marital litigation . . . regardless of how legal title is held . . . ." "A party claiming an equitable interest in property upon divorce bears the burden of proving the property is marital." *McMillan v. McMillan*, 417 S.C. 583, 591, 790 S.E.2d 216, 220 (Ct. App. 2016) (citation omitted). "If the party presents evidence to show that the property is marital, the burden shifts to the other spouse to present evidence to establish the property's nonmarital character." *Id.* "If the opposing spouse can show that the property was acquired before the marriage or falls within a statutory exception, this rebuts the prima facie case for its inclusion in the marital estate." *Id.* (citation omitted). Once the family court determines that property is nonmarital, it lacks jurisdiction and authority to apportion it. S.C. Code Ann. § 20-3-630(B) (2014); *see Bowen v. Bowen*, 327 S.C. 561, 566, 490 S.E.2d 271, 273 (Ct. App. 1997) (finding the family court was not permitted to address real estate excluded from the marital estate by a prenuptial agreement).

Wife may gain an interest in Husband's nonmarital property if she proves that she contributed to the assets' value after the parties married. *See* S.C. Code Ann. § 20-3-630(A)(5) (2014) ("any increase in value in nonmarital property, except to the extent that the increase resulted directly or indirectly from efforts of the other spouse during marriage [constitutes nonmarital property]"). The "special equity doctrine" was described by this court as follows:

> "Where a wife has made a material contribution to the husband's acquisition of property during coverture, she acquires a special equity in the property." *Wilson v. Wilson*, 270 S.C. 216, 241 S.E.2d 566, 568 (1978) (quoting 27B C.J.S. Divorce § 293 (1950)). Therefore, one spouse acquires a special equity in the property of the other if (1) the property was acquired during coverture, (2) the spouse contributed to the acquisition of the property, and (3) the spouse's contribution was material.

*Webber v. Webber*, 285 S.C. 425, 427-28, 330 S.E.2d 79, 81 (Ct. App. 1985).

Here, the family court found the three Stifel Accounts to be nonmarital in nature, yet the court still required Husband to pay Wife $40,000 out of the accounts. Because Wife was the party trying to claim an equitable interest in the asset, she bore the burden of proving the accounts were marital in nature. We find Wife did not meet this burden because the only evidence she provided to prove the accounts

were marital in nature was testimony of conversations between the parties discussing their retirement plans. Wife claims she understood these conversations to mean Husband was contributing to the accounts throughout the marriage in preparation for their retirement.

We find the record does not support Wife's contentions that the three Stifel Accounts were marital in nature; therefore, she did not satisfy her burden of proof. Because the retirement accounts were nonmarital in nature, the family court erred when it awarded Wife $40,000 from such accounts. Husband is entitled to the $40,000 allocated from the accounts due to their nonmarital nature and his sole ownership of each account. Accordingly, we reverse.

## II. Valuation Dates of Assets and Debt

Husband argues the family court erred in valuing: (1) the mortgage debt on the date of the trial; (2) the marital investment account on the date of filing; and (3) the IHG credit card on the date of trial. We disagree.

"A 'marital debt' is a debt incurred for the joint benefit of the parties regardless of whether the parties are legally liable or whether one party is individually liable." *Wooten v. Wooten*, 364 S.C. 532, 546, 615 S.E.2d 98, 105 (2005). "Marital debt, like marital property, must be specifically identified and apportioned in equitable distribution." *Id.* By statute, the general rule is that marital property subject to equitable distribution is presumptively valued at the date of the divorce filing. § 20-3-630(A). Nevertheless, the parties may be entitled to share in any appreciation or depreciation in marital assets occurring after the commencement of marital litigation but before the final decree. *Moore v. Moore*, 414 S.C. 490, 522, 779 S.E.2d 533, 550 (2015) (citing *Burch v. Burch*, 395 S.C. 318, 325, 717 S.E.2d 757, 761 (2011)). The burden of proof is properly on the party seeking a deviation from the statutory filing date. *Burch*, 395 S.C. at 329, 717 S.E.2d at 763. A spouse seeking to use the value of an appreciated asset on the date of trial must show that the increase in the asset's value is due to passive, or market, forces. *Teeter v. Teeter*, 408 S.C. 485, 499, 759 S.E.2d 144, 151 (Ct. App. 2014). The only activities relevant to the passive/active analysis are those which occur after the date of filing. *Burch*, 395 S.C. at 327-28, 717 S.E.2d at 762. Our courts have long recognized that valuing a marital asset on the date of filing may not necessarily result in a fair outcome if the value of the asset changes during the pendency of the action. *See id.* (acknowledging that it is not unusual for the value of assets to change in the period of time between an action being filed and disposition). In order to fairly value an asset that appreciates or depreciates between the date of

filing and the date of trial, courts prior to *Burch* tended to look to the reason for the increase or decrease in the asset's value when determining the appropriate date of valuation. *Id*. at 326, 636 S.E.2d at 762. When an asset increased in value due to the financial or managerial contribution of one of the spouses, courts generally valued the asset on the date of filing. *Id*. An asset that increased in value due to passive forces out of the control of either spouse tended to be valued on the date of trial. *Id*.

### A. Mortgage Debt at Date of Trial

Here, the court valued the mortgage debt on the marital home as of the date of trial. Husband was in exclusive possession of the home and made mortgage payments during the pendency of the action.

Husband argues the family court erred in its failure to apply the active appreciation analysis in *Burch*. Husband voluntarily paid the first and second mortgages on the marital home during the pendency of the action without contribution from Wife. The first mortgage balance on the date of filing was $109,160.00, and it was $63,917.00 on the date of trial. Husband was solely responsible for reducing the first mortgage balance by $45,243.00 between the date of filing and the date of trial. The second mortgage was an interest-only payment credit line and the principal balance remained the same throughout the litigation.

In its final order, the court valued the mortgage balance on the date of trial and ordered the parties to equally divide the proceeds generated from the sale of the home. In making this finding, the court reasoned that 1) Husband's payment of the first mortgage during the pendency of the action maintained the status quo from the marriage; and 2) had Husband not been living in the marital home and paying the mortgages during the parties' separation, he would have incurred housing expenses "for which he would have received no equity."

We find support for the family court's ruling in *Barrow v. Barrow* 394 S.C. 603, 716 S.E.2d 302 (Ct. App. 2011), for the proposition that the active/passive analysis is not the sole criterion for justifying a deviation from the filing date valuation. This court in *Barrow* found that the husband was not entitled to a credit for mortgage payments he made post-separation. *Barrow*, 394 S.C. at 617, 716 S.E.2d at 309. The *Barrow* court considered each party's housing expenses post-separation and concluded the husband was not entitled to special credit. *Id.*

We find the court did not err by using the *Barrow* analysis rather than an active/passive analysis. Throughout the marriage, Wife was a homemaker and family caretaker, and Husband was the breadwinner. The law protects a homemaker's interest in marital property by assigning value to her indirect contribution to the accumulation of the martial estate. *Johnson v. Johnson*, 296 S.C. 289, 298, 372 S.E.2d 107, 112 (Ct. App. 1988). A homemaker's indirect contributions to a marriage in the form of caring for the parties' home and children enables the other spouse to work outside the home and accumulate wealth for the parties' mutual benefit. *Id.* We are not persuaded by Husband's argument that Wife's contribution to the marriage necessarily ends when the homemaker moves out of the marital home and leaves the marriage. Wife spent the entire marriage tending to the children and the home, and this duty continued after she left the marriage because she was still solely responsible for caring for the couple's incapacitated adult daughter, ZZ. Her full-time duties as caretaker prohibited her from making financial contributions to the marital home, but nevertheless constituted a contribution to the marriage. Additionally, after Wife moved out of the marital home, she was required to find new housing. Husband remained in the home and was not burdened by additional housing expenses. The family court acknowledged this in the Decree by stating:

> If the Defendant had not been living in the marital home during the pendency of this action, he would have had to pay rent somewhere else for which he would have received no equity. Therefore, the Court is rejecting the Defendant's request that he receive $45,000 out of the net proceeds of the sale of the marital residence. The Court does not believe that the Defendant receiving the same would be fair or equitable.

We find the family court did not err in valuing the mortgage debt of the marital home at the date of trial.

### B. *Marital Investment Account (#2142) at Date of Filing*

We find the family court was justified in using the date of filing value for the marital investment account. The account #2142 was funded from the money Husband was awarded after an accident ten years prior to the hearing. The parties agree the account was marital in nature, and both parties were aware that the accident money went into that account. At the temporary hearing, Husband was ordered to pay $5,000 in temporary attorney's fees to Wife. Husband withdrew

$40,000 from the #2142 marital account to make necessary repairs on the marital home before putting it up for sale.  Husband further testified that he used $5,000 of the withdrawal to pay the temporary attorney's fees.  Husband did not seek permission from Wife before making the withdrawal from the marital account.  Therefore, his act of withdrawing from the marital account was in direct violation of the temporary order, which stated: "Each of the parties shall be restrained and enjoined from disposing of, placing liens upon, hiding, injuring, selling, alienating, liquidating, or otherwise decreasing, in value any assets, pending a final hearing on the merits, unless the parties mutually agree otherwise in writing."  If the family court valued the account on the date of the hearing, Husband would face no repercussions from his willful violation of the temporary order.  We find the family court did not err in using the date of filing value for the Stifel marital investment account #2142.

*C. IHG Credit Card at Date of Trial*

Husband argues Wife failed to carry her burden of proving that a debt incurred on the IHG credit card after filing but before the Decree was incurred for the joint benefit of both parties.  We disagree.

"When a debt is incurred after the commencement of litigation but before the final divorce decree, the family court may equitably apportion it as a marital debt when it is shown the debt was incurred for marital purposes, i.e. for the joint benefit of both parties during the marriage."  *Wooten v. Wooten,* 364 S.C. 532, 547, 615 S.E.2d 98, 105 (2005).  "When a debt is incurred after marital litigation begins, the burden of proving the debt is marital rests upon the party who makes such an assertion."  *Id*.

In the Decree, the court found the following:

> As to the IHG Credit Card, the Court finds that the current balance on the IHG Credit Card is marital in nature.  Although [Husband] testified that this card had a balance of zero at the time of filing, there was ample testimony and evidence at trial that [Wife] continued to utilize this card during the pendency of this case in a similar manner to how the parties had always utilized this card—including for medical bills and gas.  There was also evidence and testimony that the parties had agreed during this case that [Wife] could utilize this card for

certain charges and expenses during the pendency of this action. Taking all of this evidence and testimony into consideration, the Court finds that the current balance of $6,120.00 is a marital debt . . . . [Husband] shall be solely responsible for paying this debt and he shall hold [Wife] harmless as to the same.

At trial, Wife testified that the parties agreed upon her continued use of the credit card for charges similar to those she used it for during the marriage.[2] During the marriage, Husband would typically pay $500 on this account each month. For a period of time prior to the temporary hearing, but after the filing of the action, Husband continued to pay $500 per month. The payments eventually dwindled until Husband stopped making payments altogether. Wife testified she utilized the credit card in the same manner she did during the marriage. We believe Wife met her burden of showing the debt incurred was for the joint benefit of both parties, and it is therefore marital in nature. We find the family court did not err when it valued the IHG credit card debt on the date of trial.

### III.    Wife's Vehicle and Jewelry Values

Husband argues the family court erred when valuing Wife's vehicle and jewelry because the values assigned are not supported by the greater weight of the evidence. We disagree.

"The family court has broad discretion in valuing the marital property. A family court may accept the valuation of one party over another, and the court's valuation of marital property will be affirmed if it is within the range of evidence presented." *Lewis*, 392 S.C. at 393, 709 S.E.2d at 656 (quoting *Pirri v. Pirri*, 369 S.C. 258, 264, 631 S.E.2d 279, 283 (Ct. App. 2006)).

At trial, Husband valued Wife's 2003 Toyota Land Cruiser at $6,800. Wife valued the vehicle at $3,000 and testified that she came up with this figure by subtracting the estimated repairs from the Kelley Blue Book value. Wife also obtained an estimate for the vehicle from Creel Tire Company. Wife knew of and testified to several issues with the vehicle that would decrease its value on the market. Husband offered no evidence to back up his claim that the vehicle was worth

---

[2] Such charges included medical appointments for ZZ, trips to visit the other children, gas, and food.

$6,800, and he even conceded at trial that Wife would be in a better position to know about the extensive maintenance issues plaguing the vehicle.

Similarly, Wife testified to and provided receipts at trial pertaining to the valuation of her jewelry. Wife testified that there were only two pieces of jewelry in the marital estate that were of any consequence. She believed these pieces were worth $1,000. One piece was an estate piece given to her by Husband for their first Christmas. The second piece was from Husband's jewelry inheritance from his father, which he allowed Wife to choose because she helped work on the jewelry. She had created an itemized list of values, so she was in a position to know the value of the item she selected. Husband testified there were more than two pieces at issue and he valued the jewelry at $20,000. At trial, Husband provided one "partial receipt" for the jewelry for $4,734. He claimed this partial receipt was half of what he paid for the 1999 necklace, but he provided no other evidence of additional payments. The court valued Wife's jewelry at $4,500 and allocated this asset to her. The court came to this amount because it was a number between the two values testified to by the parties, and the court considered the age of the jewelry. Accordingly, we find no error in the family court's assignment of value to Wife's vehicle or jewelry.

## IV.    Alimony Award

Husband argues the amount of alimony awarded to Wife exceeds what is reasonably supported by the evidence. He argues the family court erred in its assessment of several of the statutory factors when it ordered Husband to pay Wife alimony of $2,700 per month. Husband further claims the court erred specifically when it found that: (1) an $80,000 annual income should be imputed to Husband; (2) Husband *has the ability* to pay alimony of $2,700 per month; (3) Wife *needs* alimony of $2,700 per month; and (4) the parties lived an upper middle-class lifestyle. We disagree.

### A. Imputed annual income of $80,000

Husband argues the family court erred in imputing an annual income of $80,000 to him because the evidence does not support such imputation. We disagree.

There are generally two circumstances where a family court is justified in imputing income to a spouse for purposes of awarding alimony. First, when a spouse intentionally underreports earnings, typically from non-traditional or self-employment sources, the family court may impute income from unreported sources

or in amounts commensurate with the benefits the spouse receives from the source. *See Stoney v. Stoney*, 425 S.C. 47, 70-71, 819 S.E.2d 201, 214 (Ct. App. 2018) (holding that the court must take into account money paid by the husband's company to him or on his behalf for his travel, his child's private school, his life insurance premiums, his residential and farm mortgage payments, and money the company paid employees to perform work for the husband outside of their company duties); *Grumbos v. Grumbos*, 393 S.C. 33, 43, 710 S.E.2d 76, 82 (Ct. App. 2011) (holding that in the absence of credible information about a spouse's income, the court is justified in imputing an amount of income equivalent to the household expenses the spouse historically paid). Second, when a spouse has the ability to earn more income than he is actually earning, the court may impute income at a level appropriate for the person's work history, occupational qualifications, job opportunities, and earning levels in the community. *Sanderson v. Sanderson*, 391 S.C. 249, 255-56, 705 S.E.2d 65, 68 (Ct. App. 2010).

Here, the family court imputed an income of $80,000 to Husband based upon Husband's personal banking accounts, personal expenses he paid with business funds, and Social Security and Medicare earnings. The court found Husband's average annual income "in the several years prior to 2018 was over $86,000.00." However, upon reconsideration, the family court imputed "minimum income" to Husband of $80,000.00 per year.

The record reflects Husband is the sole owner of his chiropractic business; thus, he sets his own salary. In the year before separation, Husband reported earnings of $95,350. The year of the separation, he reported $70,300, and the year following he reported earnings of $57,000. Husband attributes his decline in income to his age and his inability to work as hard as he did in the past. Despite his claimed inability to work as hard, Husband testified that he still works full time and his patient list has not been cut. Further, Husband claimed the COVID-19 pandemic negatively impacted the gross receipts to the business in the months leading up to the trial; however, in April 2020, the business deposited $103,918.34 into its account. At trial, Husband denied any knowledge of federal COVID assistance for his business. However, in his final brief, Husband reports his business received more than $17,000 in April 2020 for stimulus and Small Business Administration assistance. At trial, Husband filed Financial Declarations indicating that he earned gross annual income of $61,892.04 and he testified that he earns gross income of approximately $5,000 per month.

Based on our own view of the evidence, we find the family court was justified in imputing income to Husband because of the dramatic fluctuations in his reported

income over the years.  We find the evidence presented at trial supports an imputed income of $80,000 to Husband.

### B.  $2,700 monthly in alimony →Ability of Husband/Necessity of Wife

Husband argues the family court erred when it found both that Husband *had the ability* to pay $2,700 per month in alimony and that Wife *needed* $2,700 per month in alimony.  We disagree.

"Alimony is a substitute for the support normally incidental to the marital relationship."  *Crossland v. Crossland*, 408 S.C. 443, 451, 759 S.E.2d 419, 423 (2014).  "Generally, alimony should place the supported spouse, as nearly as practical, in the same position as enjoyed during the marriage."  *Craig v. Craig*, 365 S.C. 285, 292, 617 S.E.2d 359, 362 (2005).  "It is the duty of the family court to make an alimony award that is fit, equitable, and just if the claim is well founded."  *Allen v. Allen*, 347 S.C. 177, 184, 554 S.E.2d 421, 424 (Ct. App. 2001).

Section 20-3-130(C) of the South Carolina Code (2014) provides the factors for the family court to consider in making an award of alimony and instructs the family court to "give weight in such proportion as it finds appropriate" to each of the following factors:

> (1) the duration of the marriage together with the ages of the parties at the time of the marriage and at the time of the divorce . . . ; (2) the physical and emotional condition of each spouse; (3) the educational background of each spouse . . . ; (4) the employment history and earning potential of each spouse; (5) the standard of living established during the marriage; (6) the current and reasonably anticipated earnings of both spouses; (7) the current and reasonably anticipated expenses and needs of both spouses; (8) the marital and nonmarital properties of the parties, including those apportioned to him or her in the divorce . . . ; (9) custody of the children . . . ; (10) marital misconduct or fault of either or both parties . . . ; (11) the tax consequences to each party as a result of the particular form of support awarded; (12) the existence and extent of any support obligation from a prior marriage or for any other reason of either party; and (13) such other factors the court considers relevant.

In considering an alimony award, "[n]o one factor is dispositive." *See Pirri v. Pirri*, 369 S.C. 258, 267, 631 S.E.2d 279, 284 (Ct. App. 2006) (quoting *Allen v. Allen*, 347 S.C. 177, 184, 554 S.E.2d 421, 425 (Ct. App. 2001)).

Here, the court considered each factor when determining a fair alimony award for Wife. Husband and Wife were married at forty-four and forty-six years of age respectively, and they were married for a total of nineteen years. Despite Husband's accident, both parties remain in fair physical and emotional health, and Husband provided no evidence that he is contemplating retirement. Husband also testified that he planned to return to his lecturing job, which would supplement his income. Wife has a B.S. in psychology while Husband has a doctorate degree in chiropractic medicine and an additional degree and certification in acupuncture medicine. Throughout the marriage, Husband was the breadwinner while Wife took care of the home and children. Wife has not worked for more than twenty years. Wife's only source of income at the time of the Decree was her social security check of $874.60 per month, plus the $670 SSI payment that she receives as sole guardian and on behalf of ZZ. After our own review of the evidence, we find the factors weigh heavily in favor of Wife, and we do not find the alimony award amount to be excessive. We find the evidence presented at trial sufficiently proves Wife's need and Husband's ability to pay. Accordingly, we find the family court did not err when it assigned Wife's alimony award.

### C. Parties' standard of living

Husband also argues the court erred when it deemed the couple's standard of living as upper-middle class, as suggested by Wife. We disagree.

We find the court did not err when it endorsed Wife's description of the standard of living the couple enjoyed throughout their marriage. The objective factors in the record prove the couples' standard of living would fall into this category, therefore we affirm the family court's decision. The parties lived in a home with a pool valued between $500,000 and $550,000 according to Husband. Further, the couple took family vacations to places such as Lake Geneva, Wisconsin, Tennessee, and "the islands." In evaluating the factors related to equitable distribution, alimony, and objective evidence in the record, we affirm the family court's decision.

## V.   Fees Awarded to Wife

Husband argues the family court erred when it awarded attorney's fees to Wife. We disagree.

"Section 20-3-130(H) of the South Carolina Code (2014) authorizes the family court to order payment of litigation expenses such as attorney's fees, expert fees, and investigation fees to either party in a divorce action." *Thornton v. Thornton*, 428 S.C. 460, 477, 836 S.E.2d 351, 360 (Ct. App. 2019). There are four factors a family court should consider in determining whether attorney's fees should be awarded to a party: "(1) the party's ability to pay his/her own attorney's fee; (2) beneficial results obtained by the attorney; (3) the parties' respective financial conditions; [and] (4) [the] effect of the attorney's fee on each party's standard of living." *E.D.M. v. T.A.M.*, 307 S.C. 471, 476-77, 415 S.E.2d 812, 816 (1992). In determining a reasonable attorney's fee, there are six factors a family court should consider: "(1) the nature, extent, and difficulty of the case; (2) the time necessarily devoted to the case; (3) professional standing of counsel; (4) contingency of compensation; (5) beneficial results obtained; [and] (6) customary legal fees for similar services." *Glasscock v. Glasscock*, 304 S.C. 158, 161, 403 S.E.2d 313, 315 (1991). "In awarding attorney's fees, the family court must make specific findings of fact on the record for each of the required factors." *Thornton*, 428 S.C. at 477, 836 S.E.2d at 360.

Here, the court considered both the *E.D.M.* and *Glasscock* factors when it determined Husband was required to pay Wife's attorney's fees. The record makes clear that Wife's ability to pay her own fees is severely hampered because she has been out of the workforce for more than twenty years, and she is responsible as sole caretaker of ZZ. Husband, on the other hand, has a significant income and thus the ability to afford attorney's fees. The second *E.D.M.* factor considers the beneficial results obtained. Here, Wife's attorney was successful in obtaining permanent periodic alimony from Husband. Much of the trial preparation was dedicated to Wife's demand for alimony and Husband's steadfast position against the alimony award. Additionally, Wife's attorney was successful in getting a 50-50 split of the marital assets. Husband's attorney was successful in convincing the court that the vast majority of his Stifel accounts were nonmarital in nature. The third *E.D.M.* factor is the parties' respective financial conditions. We have previously addressed this issue and established that Husband is substantially more financially stable than Wife. The final *E.D.M.* factor is the effect of the attorney's fees on each party's standard of living. Again, should Wife be responsible to pay her attorney's fees, she would certainly face financial strain, while Husband is in a better position to afford the fees.

After our own review, we agree with the family court's order that Wife has met her burden of proof by a preponderance of the evidence that she is entitled to a contribution toward her attorney's fees and costs from Husband.

**AFFIRMED IN PART, REVERSED IN PART.**

**MCDONALD and VERDIN, JJ., concur.**